# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| Gene Washington, Diron Talbert, and Sean Lumpkin, on behalf of themselves and all others similarly situated, | Court File No. _____ |
| Plaintiffs, | |
| v. | |
| National Football League, NFL Ventures, L.P., NFL Productions, LLC, NFL Enterprises, LLC, Arizona Cardinals, Inc., Atlanta Falcons Football Club LLC, Baltimore Ravens Limited Partnership, Buffalo Bills, Inc., Panthers Football LLC, Chicago Bears Football Club, Inc., Cincinnati Bengals, Inc., Cleveland Browns LLC, Dallas Cowboys Football Club, Ltd., Denver Broncos Football Club, Detroit Lions, Inc., Green Bay Packers, Inc., Houston NFL Holdings LP, Indianapolis Colts, Inc., Jacksonville Jaguars Ltd., Kansas City Chiefs Football Club, Inc., Miami Dolphins, Ltd., Minnesota Vikings Football Club LLC, New England Patriots, LP, New Orleans Louisiana Saints, LLC, New York Football Giants, Inc., New York Jets Football Club, Inc., Oakland Raiders LP, Philadelphia Eagles Football Club, Inc., Pittsburgh Steelers Sports, Inc., San Diego Chargers Football Co., San Francisco Forty Niners Ltd., Football Northwest LLC, The Rams Football Co. LLC, Buccaneers Limited Partnership, Tennessee Football, Inc., and Washington Football Inc., | **CLASS ACTION COMPLAINT FOR ANTITRUST VIOLATIONS** (Jury Trial Demanded) |
| Defendants. | |

## INTRODUCTION

1.      Plaintiffs Gene Washington, Diron Talbert, and Sean Lumpkin

("Plaintiffs"), on behalf of themselves and all others similarly situated, by and through

their attorneys, for this Class Action Complaint against Defendant National Football

League, NFL Ventures, L.P. and certain of its wholly-owned subsidiaries, NFL

Productions, LLC, NFL Enterprises, LLC, and the 32 NFL member clubs (collectively

"NFL" or "League")state as follows. Except as to the actions of the named Plaintiffs, the

allegations herein are based upon information and belief.

## NATURE OF ACTION

2.      Plaintiffs are retired NFL football players (also referred to hereafter as

"retired players" or "players"). Plaintiffs bring this class action on behalf of themselves

and all retired National Football League players similarly situated who have suffered

injury as a result of Defendants' conduct violating the federal antitrust laws by promoting

the National Football League, selling National Football League-related products, and

otherwise generating revenue for the National Football League and its member teams

through the unauthorized and unremunerated usage of the names, images, persona and/or

likenesses (hereafter referred to under the blanket term "identity") of Plaintiffs and

members of the Class.

3.      The Defendants include the NFL, NFL Ventures, L.P. and certain of its

wholly-owned subsidiaries (which, through its subsidiaries, serves as a marketing arm of

the NFL and its member clubs), NFL Productions, LLC, NFL Enterprises, LLC, and the

32 NFL member clubs. Although the NFL might be viewed as a type of joint venture, the

U.S. Supreme Court held last year in *American Needle, Inc. v. NFL*, 130 S.Ct. 2201, 2212-13 (2010) that each member team is legally capable of conspiring with other member teams in violation of the antitrust laws:

> The NFL teams do not possess either the unitary decision making quality or the single aggregation of economic power characteristic of independent action. Each of the teams is a substantial, independently owned, and independently managed business. "[T]heir general corporate actions are guided or determined" by "separate corporate consciousnesses," and "[t]heir objectives are" not "common." ...The teams compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel.

The Court specifically found that the NFL member clubs compete in the market for intellectual property. *Id.* at 2213.

4.    The NFL is also an adjudicated monopolist that acquired its monopoly power in the market for professional football in violation of Section 2 of the Sherman Act (15 U.S.C. §2). Thus, in *United States Football League v. NFL*, 644 F. Supp. 1040, 1057-58 (S.D.N.Y. 1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) ("USFL"), the court upheld jury determinations that: (a) the NFL held monopoly power in the professional football market and received 95% of the revenues from major league professional football and (b) the NFL had acquired that power through "predatory conduct." These findings have been given collateral estoppel effect in subsequent antitrust cases against the NFL. *See e.g.*, *McNeil v. NFL*, 790 F.Supp. 871, 889-96 (D. Minn. 1992). Those findings are entitled to similar effect in this case.

5.     For years, the NFL has earned substantial revenue by making promotional films and selling products featuring the identities of retired NFL football players, including Plaintiffs. The NFL trades on the "glory days" of the NFL as a marketing and advertising technique to convey authenticity, enhance the NFL's brand awareness and increase its revenue. The retired players who created these glory days, however, have gone almost completely uncompensated for this use of their identities. Notably, while exploiting the identities of retired players for commercial gain, the NFL prohibits retired NFL players from using their own identities as players to promote themselves commercially.

6.     Many of the retired players the NFL uses to promote itself struggle with severe physical disabilities as a result of their playing days. The players incurred these injuries by engaging in the performances the NFL now uses to advertise itself and make money. Many of these players played at a time when salaries were modest and are now struggling financially while the NFL reaps record-breaking revenues. The fact that these retired players played for such modest salaries contributed directly to the NFL's ability to grow into the multi-billion dollar entity it has become.

7.     The NFL's commercial exploitation of retired players is not only prolific, it is blatant. One need look no further than the NFL Films website to see the names of over 450 retired players being used to advertise and sell videos promoting the NFL.

8.     The NFL's conduct has violated, and continues to violate, Plaintiffs' rights of publicity and other statutory and common laws. As a result of these violations, Plaintiffs now bring this class action seeking compensation for Defendants' past

unauthorized use of the identities of retired NFL football players and to stop this egregious misconduct from going forward.

## PARTIES

### *Plaintiffs*

9.     Plaintiff Gene Washington ("Washington") is a retired NFL football player. From 1967 to 1974, Washington was a wide receiver for the Minnesota Vikings and the Denver Broncos. Washington was the Vikings' first-round draft pick in 1967, and was selected to the Pro Bowl in 1969 and 1970. He played in Super Bowl IV as a member of the Vikings. As a college player for Michigan State, Washington was on the co-National Championship team of 1966, and in 2011 was inducted into the College Football Hall of Fame in recognition of his outstanding college career. The NFL has conspired to constrain the sale of Washington's identity in order to artificially eliminate Washington's ability to receive compensation for his identity, in violation of antitrust laws.

10.     Plaintiff Diron Talbert ("Talbert") is a retired NFL football player. From 1967 to 1980, Talbert played defensive tackle for the L.A. Rams and the Washington Redskins. He was a key member of the Redskins' 1972 NFC Championship team, and was selected to the Pro Bowl in 1974. In 2002, he was selected as one of the Redskins' 70 all-time best players; one of only 23 defensive players awarded that honor. In 2005, Talbert was inducted into the Longhorn Hall of Honor at the University of Texas in Austin. Talbert runs a successful investment business and a retail grocery business. The NFL has conspired to constrain the sale of Talbert's identity in order to artificially

eliminate Talbert's ability to receive compensation for his identity, in violation of antitrust laws.

11.    Plaintiff Sean Lumpkin ("Lumpkin") is a retired NFL football player. From 1992 to 1996, Lumpkin played safety for the New Orleans Saints. Lumpkin had a very successful college career at the University of Minnesota, where he was named team MVP and won the Carl Eller Award for outstanding defensive play. The NFL has conspired to constrain the sale of Lumpkin's identity in order to artificially eliminate Lumpkin's ability to receive compensation for his identity, in violation of antitrust laws.

### Defendants

12.    Defendant NFL is a tax-exempt association under 18 U.S.C. § 501(c)(6) with its headquarters in New York, NY. The NFL operates several businesses through which it, in part, carried out the misconduct described herein. These include, but are not limited to, the NFL itself and doing business as NFL Properties, both located at 280 Park Avenue, New York, NY 10017; NFL Enterprises, also located at 280 Park Avenue, New York, NY 10017; NFL Films, located at 1 NFL Plaza, Mount Laurel, NJ 08054; and NFL Network, located at 10950 Washington Boulevard, Culver City, CA, 90232. Each of these businesses operates under the exclusive control of the NFL itself. The NFL is one of the largest entertainment entities in the world with 2008 revenues totaling an estimated $6.9 billion.

13.    Defendant NFL Ventures, L.P. ("NFLV") is a limited partnership based in Delaware that advertises, promotes and markets the NFL and its member clubs. Its

wholly-owned subsidiaries include: (a) NFL Enterprises, LLC and (b) NFL Productions LLC (also known as Films LLC).

14.     Defendant NFL Productions LLC, also known as Films LLC ("NFL Films"), produces NFL-related programming for the League and its member clubs. It also provides services, including licensing of NFL-related content to customers operating in the entertainment and media industries.

15.     Defendant NFL Enterprises LLC ("NFL Enterprises") sells, advertises and promotes broadcasts of NFL games, operates and develops the NFL website on which footage from such broadcasts is sold, and exploits new media technologies for such content.

16.     The other Defendants are the 32 NFL member teams, each of which, upon information and belief, is a corporation, except where noted below. Upon information and belief, each of the Defendant-teams is a separately-owned and independent entity which operates a professional football franchise for profit under the team name and in the cities set forth below:

| NFL Defendant Team Owner | State of Organization | Team Name |
|---|---|---|
| Arizona Cardinals, Inc. | Arizona | Arizona Cardinals |
| Atlanta Falcons Football Club LLC | Georgia | Atlanta Falcons |
| Baltimore Ravens Limited Partnership | Maryland | Baltimore Ravens |
| Buffalo Bills, Inc. | New York | Buffalo Bills |

| | | |
|---|---|---|
| Panthers Football LLC | North Carolina | Carolina Panthers |
| Chicago Bears Football Club, Inc. | Delaware | Chicago Bears |
| Cincinnati Bengals, Inc. | Ohio | Cincinnati Bengals |
| Cleveland Browns LLC | Delaware | Cleveland Browns |
| Dallas Cowboys Football Club, Ltd. | Texas | Dallas Cowboys |
| Denver Broncos Football Club | Colorado | Denver Broncos |
| Detroit Lions, Inc. | Michigan | Detroit Lions |
| Green Bay Packers, Inc. | Wisconsin | Green Bay Packers |
| Houston NFL Holdings LP | Delaware | Houston Texans |
| Indianapolis Colts, Inc. | Delaware | Indianapolis Colts |
| Jacksonville Jaguars Ltd. | Florida | Jacksonville Jaguars |
| Kansas City Chiefs Football Club, Inc. | Texas | Kansas City Chiefs |
| Miami Dolphins, Ltd. | Florida | Miami Dolphins |
| Minnesota Vikings Football Club LLC | Minnesota | Minnesota Vikings |
| New England Patriots, LP | Delaware | New England Patriots |
| New Orleans Louisiana Saints LLC | Texas | New Orleans Saints |
| New York Football Giants, Inc. | New York | New York Giants |
| New York Jets Football Club, Inc. | Delaware | New York Jets |
| Oakland Raiders LP | California | Oakland Raiders |

| Philadelphia Eagles Football Club, Inc. | Delaware | Philadelphia Eagles |
|---|---|---|
| Pittsburgh Steelers Sports, Inc. | Pennsylvania | Pittsburgh Steelers |
| San Diego Chargers Football Co. | California | San Diego Chargers |
| San Francisco Forty Niners Ltd. | California | San Francisco 49ers |
| Football Northwest LLC | Washington | Seattle Seahawks |
| The Rams Football Company LLC | Delaware | St. Louis Rams |
| Buccaneers Limited Partnership | Delaware | Tampa Bay Buccaneers |
| Tennessee Football, Inc. | Delaware | Tennessee Titans |
| Washington Football Inc. | Maryland | Washington Redskins |

17.     The foregoing Defendant entities are also referred to collectively as the "NFL" or "League."

**JURISDICTION AND VENUE**

18.     This Court has subject matter jurisdiction over the present action pursuant to 28 U.S.C. § 1337 with respect to claims arising under the Sherman Act (15 U.S.C. §§ 1, 3).

19.     Venue in this action over Plaintiffs' antitrust claims is proper pursuant to 15 U.S.C. § 22. Each of the Defendants can be found, resides, has an agent, or transacts business in the District of Minnesota, and the unlawful activities were, or will be, carried on in part by one, or more, of the Defendants within this district.

**FACTUAL BACKGROUND**

*The NFL's Collusive Conduct In Violation Of The Antitrust Laws*

20.    There exists a relevant nationwide product market for purposes of this case consisting of the sale and licensing of NFL-related content, which includes footage of NFL games and players. Defendants have monopoly power over that market. Plaintiffs and members of the Class are licensors and suppliers to that market, as well as potential entrants to that market. Defendants have conspired to exclude or deter Plaintiffs from entering that market and have conspired to eliminate compensation for their licensing to the NFL in that market. These actions injure competition in that market and unlawfully facilitate the NFL's maintenance of its dominance over that market.

21.    One way in which the League and its member clubs have sought to dominate this market is through the creation and operation of NFLV and its various subsidiaries. An Independent Auditors Report for NFLV indicated that NFLV was created in 1994 to advertise, promote and market the League and its member clubs. In 2009, NFLV had over $1.6 billion in operational revenue. In 2010, the corresponding figure was over $1.8 billion. The various subsidiaries of NFLV that are used to dominate the market identified above are described in the Independent Auditors' report as follows:

- NFL Enterprises LLC ("NFLE LLC") - NFLE LLC operations consist primarily of advertising, publicizing, promoting, marketing and selling broadcasts of NFL games through "NFL Sunday Ticket" and related programming, including the NFL Network, a television network devoted to the production and broadcast of football-related content and the broadcast of 8 live regular season games per season. NFLE LLC's operations also include the coordination of the NFL internet network, development and operation of www.NFL.com, and the exploitation of interactive and other emerging media technologies. NFL Network Services, Inc., a wholly-owned subsidiary of NFLE LLC, provides television, film, video, audio production and technical support services, both on-site and in-studio, for football related programming and such other services as requested by NFLE LLC. The operations of NFLE LLC also include the production of the Super Bowl pregame and halftime shows.

- NFL Properties LLC ("NFLP LLC") - NFLP LLC serves as the licensing, sponsorship and marketing arm of the NFL and its Member Clubs. In addition, NFLP LLC provides Super Bowl hospitality and travel related services. NFL Properties, U.K. and NFL Properties, B.V. are wholly-owned subsidiaries of NFLP LLC, and perform licensing operations in the United Kingdom and throughout Europe, respectively. Effective March 31, 2010, the licensing operations of NFL Properties, B.V. and related assets and liabilities were merged into a German subsidiary of NFL International LLC (Note 8). As a result, NFL Properties, B.V. no longer exists.

- NFL Productions LLC ("Films LLC") - Films LLC primarily produces NFL-related programming for the NFL and its Member Clubs. Films LLC also provides services to customers operating in the entertainment and media industries. NFL Productions, Inc., a wholly-owned subsidiary of Films LLC, provides cinematography and related services in connection with football-related entertainment or such other services, as requested by Films LLC from time to time.

### *The NFL's Exploitation of Class Members' Identities Without Compensation*

22.    NFL Films is the commercial filmmaking wing of the NFL and specializes in creating commercial and promotional films highlighting the NFL's past and featuring retired NFL players as the stars.

23.    According to NFL Films' own website, its explicit "function" is, "[t]o *promote the National Football League* and preserve its history for generations of future fans. To show the game, the passion and the visceral nature of the game from a player's perspective." (emphasis added). NFL Films, "launch[ed] pro football into the motion picture business."

24.    *Sports Illustrated* has called NFL Films "the most effective propaganda organ in the history of corporate America." The New York Times has said that NFL Films "has grown for nearly four decades into one of the great movie studios in the country ... While DreamWorks or Warner puts out more blockbusters, NFL Films is as innovative as any of them." Filmmaker John Frankenheimer said of NFL Films, "[w]hat NFL Films has done for me is to make me emotionally involved with teams I never cared about. Even if it's a team I never heard of, I can't turn it off."

25.    The NFL Films website further touts the promotional mission of its films:

> Unforgettable images. Raw emotion. Epic struggles. Often, these moments only come across on the big screen: part of a screenplay, performed by actors on a Hollywood back lot. NFL Films creates these same moments without re-takes, scripts or sets ... just world-renowned filmmakers fusing the visceral world of pro football and the romance of celluloid.

> A super slow-motion sequence of a quarterback launching a spiral through a gray November sky. A receiver in full stride leaps to make a mid-air catch. A defender pulls him to the ground and brings the scene to an abrupt end. The play happens instantly. The moments last a lifetime.

> Stunning cinematography. Exclusive all-access sound. Stirring orchestral music. Poignant storytelling. These hallmarks define the NFL Films style ... often imitated but never equaled.

> NFL Films productions aren't just seen, they're felt.

26.    Of course, the nameless "quarterback," "receiver" and "defender" NFL Films describes as starring in its promotional, revenue-generating films are not nameless. They are retired NFL Players and Defendants use their identities in its films to promote

itself, sell products, and make money without compensating these Players for the use of their identities.

27.     One NFL team owner, Robert Kraft of the New England Patriots, explained the commercial value of NFL Films: "[t]he film library, the asset base that's there, the programming ... it's sort of like Beatles music or Beethoven's symphonies or Brahms. When you and I aren't here anymore, people will still love to watch it because of the quality of it and the uniqueness and the appeal."

28.     NFL Films productions are not broadcasts, re-broadcasts, or basic accounts of NFL games. As the NFL makes clear, "[f]ull game prints are not available from NFL Films or any other source. It is impossible to obtain a copy of an entire NFL game." Rather, NFL Films productions are promotional film productions with scripts, music, editing, direction and production completely independent of the play and production of the games themselves. The NFL makes this distinction clear. Rather than simply showing game footage, "NFL Films goes back and looks at the story of the game. NFL Films is interested in the struggle, not the strategy of the game. Through editing, music, writing, and use of the players' identities, NFL Films gives fans a perspective of the game that perhaps they were not aware of when they watched the broadcast on network television."

29.     The NFL disseminates the works of its NFL Films division several ways. By way of example only, the NFL broadcasts NFL Films features on its own NFL Network, and for years has licensed productions to cable television stations such as ESPN, ESPN Classic, HBO, and major non-cable networks. The NFL also sells NFL Films movies directly to consumers in catalogs, over the Internet, and at retail outlets.

30.   The NFL has realized substantial revenues from NFL Films, including but not limited to, fees paid by networks to air the films, revenue from advertisements run during the broadcast of the films, sales of the films as individual products, and from the revenue generated by the realized promotional effect of the films on the NFL's brand and marketability.

31.   Using its NFL Network alone, the NFL broadcasts "hundreds of hours" of NFL Films productions and other programming featuring retired NFL players each year. As the NFL describes it, "[a]s a year-round channel, NFL Network will draw heavily on the resources of NFL Films and its new 200,000 square foot television and film studio complex as well as its immense film library to produce hundreds of hours of original and classic programming including, *NFL Films Presents* and *NFL Films Presents - Game of the Week in HD, Playbook, College Football Sunday, Football America, Point After*, and *Film Session*. With more than 100 million feet of film in its library, NFL Films is the backbone of NFL Network."

32.   The NFL also sells hundreds of different NFL Films productions directly to consumers, nationally and internationally, at retail outlets, in catalogs and over the Internet at www.nflfilms.com, www.nflshop.com and through Warner Home Video at www.profootballdvd.com.

33.   The NFL Films website, for example, currently offers hundreds of productions available for purchase for $50 each. The NFL uses the names of specific retired NFL players to promote many of the films for sale. On the "Special Order Catalog" portion of the NFL Films website alone, the NFL uses the specific names of

over 450 retired NFL players to promote and sell NFL Films productions. The NFL uses the identities of these and hundreds of other retired NFL players on the packaging, advertising, and sales descriptions of other NFL Films productions and products available elsewhere.

34.    For example, the NFL sells an entire line of NFL Films productions under the heading "History." This includes films for sale such as "The Fabulous Fifties, Volume II." The NFL's sales description for this film states: it "Includes Bobby Layne, the 'Alley Oop' pass, Ollie Matson, Dallas Texans/Baltimore Colts." Other films include, "NFL's Greatest Moments of the Last 25 Years," and "Sensational 60's," for which the sales description reads, "Bucky Pope, Greg Cook, Joe Namath, George Halas, and Don Meredith."

35.    Another series of videos sold on the NFL Films website is called "This is the NFL." The NFL's sales description of "Show #5" in this series states: "Football by the Numbers, Blocking Back, Fred Dryer, Steve Largent, Ground Game Leaders (Falcons, Bears)."

36.    NFL Films productions feature far more players than the 450-plus specifically named on the NFL Films website to sell products.

37.    On its website, NFL Films claims to be the "exclusive" holder of all rights in all NFL footage, regardless of its source.

38.    In addition to television broadcast and video sales, the NFL pervasively uses the internet to broadcast and feature NFL Films productions containing the identities

of retired players on its website and on the affiliated websites of each of its member clubs, which are part of the "NFL Internet Network."

39.     In addition to selling NFL-related footage, the NFL — through NFL Films — licenses the use of NFL-related film footage and the identities of retired NFL Players for numerous other commercial purposes to companies such as QVC or Pepsi-Cola, Co. In such licenses, it advises licensees in a boilerplate provision that the license does not give the licensee the right to use for any purpose any person or entity appearing in the film footage being licensed and that licensee may need to pay for additional rights from such persons or entities in connection with its use of such footage (although the NFL makes no effort to ensure that the licensee actually does so). Thus, NFL Films recognizes in its dealings with third parties that it did not acquire all license rights with respect to the identities of members of the Class and that such third parties may need to pay the person or entity being depicted extra compensation for them, yet refuses to follow a similar precept in its own marketing efforts. This decision not to compensate Class members for the use of their identities was and is the product of an agreement between the League and its member clubs that has been effectuated by NFVP and its subsidiaries, including NFL Films.

40.     Congress has taken note of the NFL's use of NFL player identities for promotional purposes. In 2008, Congresswoman Linda Sanchez of California held a congressional hearing to collect testimony and analyze the widely-reported physical and economic plight of retired NFL players. Her findings illustrated the dire situation many

retired NFL players face, while the NFL continues to use their likenesses to generate revenue.

41.     Congresswoman Sanchez found that, "half of all players retire because of injury, sixty percent of players suffer a concussion, at least one quarter of players suffer multiple concussions, and nearly two-thirds suffer an injury serious enough to sideline them for at least half of a football season." She also found that "[t]he evidence suggests that the vast majority of [retired] players needing [health] benefits do not receive them. What is even more troubling is that *through projects such as NFL Films, the NFL continues to profit off those very same players* who are denied benefits." (emphasis added).

42.     The NFL has disseminated, and to this day disseminates, NFL Films and other utilizations of the identities of Plaintiffs and members of the Class in all fifty states and around the world on multiple television stations, including, but not limited to, the NFL Network, ESPN, ESPN Classic, and HBO, as well as via the Internet. The NFL has earned substantial revenue from these uses of Plaintiffs' identities and has caused damage to Plaintiffs and members of the Class in all of those jurisdictions.

43.     Upon information and belief, the NFL has sold, and to this day sells, NFL Films productions and other utilizations of the identities of Plaintiffs and members of the Class in all fifty states and around the world. The NFL has therefore caused damage to Plaintiffs and members of the Class in all of those jurisdictions.

44.     The NFL has used the identities of Plaintiffs and members of the Class commercially on the Internet, to promote the NFL's brand, to sell products, and to

otherwise increase the NFL's revenue as an independent entity and on behalf of its thirty-two member clubs.

45.     All Plaintiffs and members of the Class whom the NFL has used to generate revenue are readily identifiable because they are portrayed by name, image, uniform, uniform accessories, number, signature moves, actions, or words and/or other unique indicia. In addition, upon information and belief, the NFL has digitized its entire NFL Films library and archives so that Plaintiffs and class members may be easily searched for and isolated by year, game, team, and even player name.

### The NFL's Exclusionary Efforts Against Retired Players

46.     The NFL is eminently aware of the extremely high value of the identities of its players and takes extreme measures to restrict access and dissemination of NFL player footage, images, and identities in any form. For instance, the NFL restricts media, including local news outlets, to showing, in any fashion, only 45 seconds per day of footage of NFL players shot at league or team facilities. This includes non-playing situations such as news conferences, interviews and practice-field reports. If a media outlet shows any footage on its website, the NFL requires the outlet to provide links to both www.nfl.com and to the player's NFL team's website. The NFL bars nonaffiliated media outlets from selling any Internet advertising connected to the presentation of NFL player footage on non-NFL affiliated websites.

47.     The NFL restriction of player footage, images, and identities is not limited to current players. If a media outlet, such as a local news station, wishes to use footage of retired players as part of reporting the news, it must pay the NFL steep fees.

48.     The NFL also prohibits retired NFL players from using their own identities as players to promote themselves commercially or otherwise for profit. If, for example, a retired player attempted to promote himself, his business, or his charity by showing footage of himself as a player, the NFL would immediately order him to cease. Of course, the NFL does in certain circumstances allow such promotional uses by retired players, but only if a player pays exorbitant sums for the right to do so. Even then, the player is at the mercy of the NFL, which maintains the ability to withdraw its permission at any time, for any reason or no reason at all.

49.     For example, following his career, retired NFL player Toby Wright ("Wright") sought to use his identity as an NFL player to promote two businesses - one a sports' bar and the other a training facility. In both cases, he was informed that he had to pay the NFL $100,000 to use his **own** identity as a player; Wright was unable to pay such a large amount. Even more incredibly, Wright has not even been able to use his identity as an NFL player to promote his charity. When he attempted to have pictures of himself as a player photocopied for a charity event, the copy center he used informed him the pictures *of himself* were owned by the NFL and the business refused to copy them. Similar stories run rampant through the putative class.

50.     While barring Wright (and many other retired players similarly situated) from using his own identity as a player to promote himself, the NFL itself has profited handsomely from using Wright's identity as a player. The NFL has featured Wright in NFL film footage to generate revenue for the league, including in its "Hardest Hits" productions. The NFL has even licensed NFL Films productions featuring Wright to

19

*Sports Illustrated*, which in turn used the productions and Wright's identity to obtain subscribers.

51.     Similarly, Jan Stenerud ("Stenerud"), an NFL Hall of Fame ("HoF") placekicker for the Kansas City Chiefs ("Chiefs"), sought to market a kicking tee he designed and developed around 1980. He created an instructional booklet for it and wanted to include film footage of his own NFL game performances in a video offered to supplement that booklet. The NFL prohibited him from using his photograph in a Chiefs' uniform or with the team colors, making the short instructional video in a Chiefs' jersey, or using film of his past play, without paying a prohibitive licensing fee. When he tried to use the HoF logo on his tee, he was told that the HoF could not license it to him without NFL permission. Thus stymied, Stenerud applied for and received an NFL license to sell the tee with the League's NFL Properties logo, for which he paid a royalty of 10% of the tee's wholesale price for over 8 years. The NFL subsequently terminated his license arbitrarily and suddenly, with then-Chief Operating Officer (now Commissioner) Roger Goodell telling Stenerud "we have decided to consolidate our small vendors." Tees sold with NFL or NFL Properties identification are now manufactured by Wilson Sporting Goods.

52.     Likewise, Brad Benson ("Benson"), a retired New York Giants player, owns an import car dealership in New Jersey and at one time ran a short advertisement in the New York/New Jersey market showing a photograph of him in uniform blocking a Washington Redskins player during a game. He received a call shortly thereafter from the NFL telling him he could not use his own photo in the ad and had to remove it.

53.     Dryer, Wright, Stenerud, and Benson are but only a small sampling of repeated instances of the NFL's predatory conduct.

54.     In order to help maintain its control of this licensing market, the NFL pays "rewards" to persons who scan for and identify what the League refers to as "cheaters" who use NFL-related content that the League deems to be proprietary.

**The NFL Has Profited From Its Anticompetitive Scheme**

55.     The NFL's intent in restricting public access to the identities of its players is to drive fans and revenue to NFL-owned and affiliated outlets to view NFL images, footage and programming and away from non-NFL-owned and affiliated outlets. As one team spokesman, the Washington Redskins' Chris Helein, informed the *Washington Post*, "[t]here are a number of reasons for [barring videographers], but it's basically a content issue[.] I won't hide ... the fact that the NFL and everything that surrounds it is valuable content."

56.     NFL spokesman Greg Aiello ("Aiello") further confirmed the substantial *commercial* value of footage of NFL players — wholly apart from the historical or newsworthy value of any broadcast of NFL games. According to Aiello, the NFL restricts media access to players because:

> We're trying to balance protection of our business assets with the equally important need to receive extensive news media coverage and communicate with as many fans as possible on a regular basis. We have no interest in controlling or limiting what news Web sites do, except limiting the use of video that undermines our own Internet operations. We have important business interests on the Internet, and we have to be careful about that.

57.    It is in part because of this extremely high value that the NFL created its own NFL Network in 2003 to drive and capture fans seeking programming related to professional football. As the NFL describes it, "NFL Network is a melting pot of gridiron greats from the NFL's past, present and future that will sate the voracious appetites of millions of football fans across the country."

58.    Further evidence of the great value of NFL players' likenesses is found in the standard player contract for NFL players. The NFL has required active player contracts to include clauses granting the NFL the authority to use the players' identities to publicize and promote the NFL. Of course, any such assignments do not apply to retired players, as their player contracts are, by definition, no longer in force. In the 2011 Collective Bargaining Agreement entered into between the NFL and the NFL Players Association, the League sought to rectify this dispositive omission.

59.    By commercializing the identities of its players, both active and retired, the NFL has become one of the largest entertainment conglomerates on the planet, netting an estimated $6.9 billion in 2008 alone.

60.    The NFL did not begin earning billions of dollars in revenue overnight; it began earning revenue gradually over many years with the support and sacrifice of the players who played the game. These retired NFL players, as a group, suffer severe physical maladies and disabilities as a result of the sacrifices they made to make the NFL what it is today. Most retired players played before the era of multi-million dollar contracts or played only a few seasons and are struggling financially while the League

they helped build reaps record-breaking revenue. There is thus an *overwhelming* interest in compensating these players for the commercial use of their identities by the NFL.

61.   By their present Complaint, Plaintiffs and members of the Class seek nothing more than to obtain their fair share of the revenues the NFL has earned, and will earn, by its use of retired players' identities. Plaintiffs therefore bring this action to provide long awaited resolution for the players who made and continue to make professional football the most popular sport in America.

## CLASS ACTION ALLEGATIONS

62.   Plaintiffs reallege all previous paragraphs as if fully stated herein.

63.   Plaintiffs bring this class action on behalf of themselves and all others similarly situated, for all claims alleged herein, pursuant to all applicable provisions of Rule 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure.

64.   The Class that Plaintiffs seek to represent is composed of:

> All persons who played professional football for any NFL member team prior to March 11, 2011, who are retired or no longer active, and whose name, voice, image, likeness, or other indicia of identity has been used by the NFL during the period from four years prior to the date on which this complaint was filed to the date on which the Class is certified in order to promote the NFL or any of its member teams, sell NFL-related products or services, or otherwise to increase the brand awareness or obtain revenue for the NFL or any of its member teams.

65.   Alternatively, should it be found that any of Plaintiffs' state law claims could not be certified on a national basis, Plaintiffs seek statewide subclasses (or groups of statewide subclasses) for these same persons.

66.     Plaintiffs specifically exclude from the Class the NFL and any related entities, all subsidiaries or affiliates of the NFL; any entity in which the NFL has a controlling interest; and any and all of the NFL's employees, affiliates, legal representatives, heirs, successors or assignees.

67.     Plaintiffs also specifically exclude from the Class the Judge and Magistrate assigned to this case and any member of their immediate families.

68.     As shown below, this class action satisfies all requirements under Rule 23(a) and (b )(3) of the Federal Rules of Civil Procedure, including but not limited to the elements commonly referred to as numerosity, commonality, typicality, adequacy and superiority.

a.      **Numerosity.** Consistent with Rule 23(a)(1) of the Federal Rules of Civil Procedure, the proposed Class "is so numerous that joinder of all members is impracticable." Upon information and belief, based on information obtained from news reports in the public media and investigation of counsel, the number of members of the proposed Class is believed to exceed 10,000.

b.      **Commonality.** Consistent with Rule 23(a)(2) of the Federal Rules of Civil Procedure, the proposed Class shares "common questions of law or fact." Defendants have engaged in a common course of misconduct toward Plaintiffs and members of the proposed Class, including but not limited to using Plaintiffs' identities to promote the NFL commercially and to sell NFL-related products. This common course of misconduct, resultant injury to Plaintiffs and the members of the Class and the remedies available to all such persons demonstrates the propriety of class certification.

c.   **Typicality.**   Consistent with Rule 23(a)(3) of the Federal Rules of Civil Procedure, the claims of the proposed Class Representatives, "are typical of the claims ... of the class." Plaintiffs and all members of the proposed Class who have had their identities used by the NFL for commercial or promotional purposes have suffered damages as a result of the NFL's wrongful acts and misconduct. The Named Plaintiffs' factual and legal claims arise out of the same uniform misconduct perpetrated by Defendants in a similar manner against both Plaintiffs and members of the Class. Thus, the evidence and legal theories underlying Plaintiffs' claims are identical to those underlying the claims of all members of the putative Class.

d.   **Adequacy.**   Consistent with Rule 23(a)( 4) of the Federal Rules of Civil Procedure, Plaintiffs "will fairly and adequately protect the interests of the class." Plaintiffs have no adverse or conflicting interests to the proposed Class members. Plaintiffs have retained Bob Stein LLC, Hausfeld LLP and Zimmerman Reed  P.L.L.P., among other law firms, who are competent counsel experienced in complex, class action litigation and possess the necessary financial resources to adequately and vigorously litigate this class action.

e.   **Predominance.**   Consistent with Rule 23 (b)(3) of the Federal Rules of Civil Procedure, common questions of law and fact predominate over individual issues. Common questions include but are not limited to the following:

- Did the League and its member clubs agree to use Plaintiffs' and Class members' identities without compensation and effectuate that agreement through the NFL and its subsidiaries?

- Did these acts reduce or eliminate competition in the market for the sale and licensing of NFL-related content?

- Are Plaintiffs and members of the Class entitled to relief under Section 1 of the Sherman Act (15 U.S.C. §§ 1, 3)?

- Are Plaintiffs' and Class members' claims barred in whole or in part by any of Defendants' affirmative defenses?

- Did Plaintiffs and Class members suffer damage as a result of the NFL's use of their identities?

    **f.**    **Superiority.**  Consistent with Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is a superior method of resolving this action. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for the party opposing the Class and would lead to repetitious trials of the numerous common questions of law and fact. Plaintiffs know of no difficulty of any kind that would make a class action in this case unmanageable.

    69.    The Class also satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because, as set forth herein, Defendant has acted and/or refused to act on grounds that apply generally to Plaintiffs and members of the Class, thereby warranting appropriate injunctive and/or declaratory relief respecting the Class as a whole.

    70.    Proper and sufficient notice of this action may be provided to the Class members through actual notice to retired NFL players tracked by the NFL, and/or NFL member clubs, among other methods.

    71.    Plaintiffs and members of the Class have suffered harm and damages as a result of Defendants' wrongful conduct as alleged herein. Absent representative action,

Plaintiffs and the members of the Class will continue to suffer losses thereby allowing Defendants' violation of law to proceed without remedy, and allowing Defendants to retain the proceeds of its ill-gotten gains.

## CAUSE OF ACTION

### (For Violations of the Sherman Act)

72.     Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

73.     Defendants, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, have entered into a continuing contract, combination, and conspiracy in restraint of trade to artificially depress, fix, maintain, and/or stabilize the prices paid (specifically, depressing, fixing, maintaining and stabilizing them at zero dollars) to Plaintiffs and members of the Class for the use of, and to limit supply for, licensing and sale of names, images and likenesses in the United States and its territories and possessions, in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

74.     This unreasonable restraint has artificially eliminated any payment by Defendants to Plaintiffs and the members of the Class for use of their identities.

75.     Plaintiffs and the members of the Class received less than they otherwise would have received for the use of their identities in a competitive marketplace, were thus damaged, and seek to recover for those damages.

76.     Defendants' collective refusal to compensate Plaintiffs and the members of the Class are not connected to any legitimate non-commercial goal. Defendants' actions are solely to enhance revenue for themselves and their for-profit business partners, by

cutting costs, *i.e.*, eliminating the need to pay any compensation to Plaintiffs and the members of the Class for the continuing commercial exploitation of their identities.

77.     As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of the Class have been injured and financially damaged in amounts which are presently undetermined.  Plaintiffs' and Class members' injuries consist of receiving lower prices for use of their identities than they would have received absent Defendants' conduct.  Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

78.     Defendants have collectively conspired to illegally limit and depress the compensation of Plaintiffs and the members of the Class for continued use of their identities to zero.  This anticompetitive and illegal scheme has unreasonably restrained trade.

79.     The anticompetitive effects of Defendants' scheme substantially outweigh any alleged procompetitive effects that may be offered by Defendants.  Reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.  The challenged restraints here are in no way necessary to produce professional football.

80.     Plaintiffs and Class members are entitled to a declaratory judgment that Defendants are violating Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by reason of their anticompetitive scheme.

81.     Plaintiffs and members of the Class are entitled to preliminary and permanent injunctions under 15 U.S.C. § 26 that terminate the ongoing violations alleged.

82.     Plaintiffs and members of the Class are entitled to recover treble damages, as well as attorneys' fees and costs, under 15 U.S.C. § 15 with respect to the violations alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief against Defendants as follows:

1.     Certify a plaintiff class as defined herein;

2.     Appoint Plaintiffs Gene Washington, Diron Talbert, and Sean Lumpkin as Class Representatives;

3.     Appoint Plaintiffs' counsel Bob Stein LLC, Hausfeld LLP and Zimmerman Reed P.L.L.P. as Lead Class counsel;

4.     Award Plaintiffs treble damages for their antitrust claims;

5.     Award Plaintiffs equitable and injunctive relief as allowed by law;

6.     Award Plaintiffs costs and attorneys' fees against Defendants as allowed by law;

7.     Grant such other or further relief as allowed by law and as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: November 15, 2011

Michael D. Hausfeld
James J. Pizzirusso
**HAUSFELD LLP**

By: _Robert A. Stein_
Robert A. Stein (MN Bar No. 104930)
**BOB STEIN LLC**

29

1700 K Street, NW, Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201
Email: mshausfeld@hausfeldllp.com
Email: jpizzirusso@hausfeldllp.com

Michael P. Lehmann
**HAUSFELD LLP**
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
Email: mlehmann@hausfeldllp.com

Mark J. Feinberg (MN Bar No. 28654)
Michael E. Jacobs (MN Bar No. 0309552)
Shawn D. Stuckey (MN Bar No. 0388976)
**ZELLE HOFMANN VOELBEL &
MASON LLP**
500 Washington Avenue South, Suite 4000
Minneapolis, MN 55415
Telephone: (612) 339-2020
Facsimile: (612) 336-9100
Email: mfeinberg@zelle.com
Email: sstuckey@zelle.com

Thomas J. Ward
Daniel S. Ward
**WARD & WARD, P.L.L.C.**
2020 Street, N.W.
Washington, D.C. 20036
Telephone: (202) 331-8160
Facsimile: (202) 503-1455
Email: tom@wardlawdc.com
Email: dan@wardlawdc.com

10125 Crosstown Circle, #200
Eden Prairie, MN 55344
Telephone: (952) 829-1043
Facsimile: (952) 829-1040
Email: rastein66@ao1.com

Charles Zimmerman (MN Bar No. 120054)
J. Gordon Rudd, Jr. (MN Bar No. 222082)
Brian C. Gudmundson (MN Bar No.
336695)
ZIMMERMAN REED, P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone: 612.341.0400
Facsimile: 612.341.0844
Email:
charles.zimmerman@zimmreed.com
Email: gordon.rudd@zimmreed.com
Email: brian.gudmundson@zimmreed.com

Daniel E. Gustafson (MN Bar No. 202241)
**GUSTAFSON GLUEK PLLC**
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
Email: dgustafson@gustafsongluek.com

Shawn M. Raiter (MN Bar No. 240424)
**LARSON KING LLP**
2800 Wells Fargo Place
30 East Seventh Street
Saint Paul, MN 55101
Telephone: (651) 312-6518
Facsimile: (651) 789-4818
Email: sraiter@larsonking.com

v4